BIGELOW v. CALUMET & HECLA MINING CO. et al. (two cases).

(Circuit Court of Appeals, Sixth Circuit. February 18, 1909.)

Nos. 1,897, 1,898.

1. MINES AND MINERALS (§ 105*)—MINING CORPORATIONS—POWERS—PURCHASING STOCK IN OTHER CORPORATIONS—MICHIGAN MINING STATUTE.

Pub. Acts Mich. 1905, p. 153, No. 105, which authorizes mining corporations organized under the laws of the state to purchase and hold stock in other mining companies, is within the power to amend the general incorporation law reserved by article 15, § 1, of the state Constitution, and does not so interfere with the contract between a stockholder and the corporation as to require the stockholder's acceptance of it as an amendment of the charter, and, if such acceptance were necessary, user of the power would be sufficient.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 105.*]

2. CORPORATIONS (§ 197*) — PURCHASING STOCK IN OTHER CORPORATIONS — RIGHTS AS STOCKHOLDERS.

A corporation having statutory power to purchase and hold stock of another corporation has the incidental power to vote the same.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 760; Dec. Dig. § 197.*

Acquisition by corporation of stock of other corporation, see note to Anglo-American Land, Mortgage & Agency Co. v. Lombard, 68 C. C. A. 120.]

3. MONOPOLIES (§ 9*) — COMBINATIONS IN RESTRAINT OF TRADE — FEDERAL STATUTE.

The power of Congress to legislate on the subject of contracts and combinations in restraint of trade is derived from its constitutional power to regulate interstate and foreign commerce, and the Sherman anti-trust act of July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), is to be so construed, and applies only to contracts or combinations which directly, immediately,· and necessarily affect commerce among the states or with foreign nations.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 9.*]

4. MONOPOLIES (§ 20*)—COMBINATIONS IN RESTRAINT OF TRADE—COMBINATIONS BY MINING CORPORATIONS.

That one Michigan mining corporation engaged in mining and refining copper wholly within that state, by purchases of stock and obtaining proxies from other stockholders, secured voting control of a majority of the stock of another similar corporation operating adjoining mines, and purposed to use such control to place in its directory a majority from its own board of officers, all of which it had the right to do under the laws of the state, did not directly or necessarily affect interstate or foreign commerce, and such control is not of itself illegal as a combination in restraint of such trade or commerce in violation of the Sherman anti-trust act of July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), in the absence of evidence of an unlawful intent to so use it as to bring about the prohibited restraint or monopoly, and not in a lawful way in the interest of an economical management of both companies.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*]

5. MONOPOLIES (§ 20*)—COMBINATIONS IN RESTRAINT OF TRADE—COMBINATIONS BY MINING CORPORATIONS.

Neither "Lake Copper" nor that part classed as "Best Lake" is so far a distinct commercial commodity as to justify the exclusion of Western or electrolytic copper as a factor in determining whether a combination of two corporations, together producing less than one-half of the Lake

copper and about one-ninth of the production of the United States, constitutes a monopoly.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*]

6. MONOPOLIES (§ 20*)—COMBINATIONS IN RESTRAINT OF TRADE—MICHIGAN STATUTES.

The purchase by one Michigan mining corporation of the stock of another, expressly authorized by statute, and thereby and with the aid of proxies from other stockholders securing control of the latter, *held*, under the evidence, which showed that the two together produced only about one-ninth of the copper of the United States, not in violation of the Michigan statutes prohibiting monopolies and combinations in restraint of competition (Pub. Acts Mich. 1899, p. 409, No. 255, and Pub. Acts Mich. 1905, p. 507, No. 329), nor was the purchase by such corporation of additional lands excessive and unlawful under the laws of the state.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*]

Appeals from the Circuit Court of the United States for the Western District of Michigan.

For opinion below, see 167 Fed. 704.

H. E. Boynton and A. C. Denison, for appellant.

Otto Kirchner and A. F. Rees, for appellees.

Before LURTON and SEVERENS, Circuit Judges, and COCHRAN, District Judge.

LURTON, Circuit Judge. These cases have been heard together upon the same transcript. The solution of the questions presented by one will substantially determine the other. The first and principal bill is that of Albert S. Bigelow against the Calumet & Hecla Mining Company and the Osceola Consolidated Mining Company. The complainant, Bigelow, is a citizen of Boston, Mass. The defendants are copper mining companies created under the laws of the state of Michigan. The complainant is a large stockholder in and president of the Osceola Consolidated Mining Company. In his character as a stockholder of that company he has filed this bill to enjoin the Calumet & Hecla Company from voting shares of the capital stock of the Osceola Company owned by it, and also to enjoin it from voting certain proxies held in its interest, at the annual stockholders' meeting for the election of a board of directors which was about to occur when the bill was filed.

The bill in the second case was filed by Mr. Bigelow in his character as a small holder of shares of the capital stock of the Calumet & Hecla Company, acquired since the starting of the first suit, for the purpose of questioning the legality of the purchase by that company of some 50,000 acres of additional copper-producing lands in Michigan, and also for the purpose of questioning the power of that company under its charter, as well as under the federal and state legislation against monopolies and illegal restraints of trade and commerce, and to enjoin that corporation from acquiring other mining lands or shares of stock in other mining companies and from exercising the power of voting upon any such shares already acquired.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

An injunction pendente lite was granted under the first bill. The grounds for this action are found in an opinion by Judge Knappen. 155 Fed. 869. No injunction was applied for under the second bill. Upon a final hearing the bills in both cases were dismissed. Pending this appeal the injunction, which operated to preserve the status quo by preventing the election of directors pending this suit, was continued.

The essential facts are these: Both companies are Michigan corporations engaged in mining and refining copper. The properties of the two companies are contiguous and situated in the copper district of the northern peninsula of Michigan. The Calumet & Hecla Company has bought outright 22,671 shares of the capital stock of the Osceola Company, and has obtained proxies, which are held in its interest, in part with options of purchase, in an amount sufficient with its holdings to make a majority of the 100,000 shares which constitute the total capital stock of the Osceola Company. There is no doubt but that the purpose of the acquisition was to enable the Calumet Company to elect a majority of the directors of the Osceola Company from the board of the Calumet Company. This was avowed in circular letters soliciting proxies from the shareholders of the former company. That such company was to continue its operations as an independent company is equally clear. No other course was possible, though one should eliminate the other so far as active competition might result from the control of a majority of the shares and the exercise of the power of selecting directors incident to such stock control.

We need not consider the power at common law of such corporations to own and vote shares in similar corporations, for the reason that in Michigan the Legislature has not deemed such restrictions wise or desirable, for there have been a series of enactments relaxing the common-law rule. Comp. St. Mich. § 7012, Pub. Acts Mich. 1903, pp. 382, 383, No. 233, culminating in the act of 1905, No. 105, Pub. Acts Mich. 1905, pp. 153, 154, which provides that corporations organized under the Michigan mining law or under any other laws for refining, smelting, or manufacturing ores, metals, or minerals may "subscribe for, purchase, own or dispose of stock in any company organized under this act, or under any other laws, foreign or domestic, for the purpose of mining, refining, smelting or manufacturing any or all kinds of ores or minerals." That the latter act does not so seriously interfere with the contract between the company and its shareholders as to require the shareholders' acceptance as an amendment of the charter powers, we think clear. The amendment, while allowing a wide expansion of the business operations of such companies, is not so fundamental as to be beyond the power of the Legislature under the constitutional reservation of the power to alter or amend the general constating act under which corporations may be organized in Michigan. Attorney General v. Looker, 111 Mich. 498, 69 N. W. 929; Looker v. Maynard, 179 U. S. 46, 21 Sup. Ct. 21, 45 L. Ed. 79; Louisville Trust Company v. Railroad Co., 75 Fed. 445, 448, 22 C. C. A. 378. User of the

power conferred by the amendment is evidence of acceptance, if acceptance be necessary. Miller v. Insurance Co., 92 Tenn. 167, 21 S. W. 39, 20 L. R. A. 765; Cahill v. Kalamazoo Mutual Ins. Co., 2 Doug. (Mich.) 124, 43 Am. Dec. 457. The right to vote stock so lawfully acquired is, of course, an incident to ownership. Comp. Laws Mich. § 7002. Rogers v. Railroad Co., 91 Fed. 299, 312, 33 C. C. A. 517; Taylor v. Southern Pacific R. R. Co. (C. C.) 122 Fed. 147, 151. There is nothing, therefore, in the laws of Michigan which forbids the holding or voting of these shares owned, or those for which proxies are held in the interest of the Calumet Company, unless such ownership or voting shall result in an illegal monopoly or combination in restraint of trade, either under the federal anti-trust act or the Michigan anti-monopoly act of 1899, p. 409, No. 255, and the Public Acts of Michigan of 1905, p. 507, No. 329. In view of the very broad powers expressly conferred by the state of Michigan to such corporations to buy and hold shares in similar companies, it is very clear that, if the incidental voting powers and the ownership of the shares in question is not an illegal monopoly in restraint of trade, the question of the effect upon interstate commerce aside, it was not forbidden by the laws of Michigan. We shall therefore deal with the case in its aspect under the federal act forbidding restraints and monopolies.

Laying on one side, therefore, many interesting questions which have been discussed by counsel as going to the possibility of relief under these bills, we come to the application of the act of July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200). The relevant sections are the first and second. They are as follows:

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding, or by both said punishments, in the discretion of the court."

"Sec. 2. Every person who shall monopolize or attempt to mc opolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

We shall assume at the outset that the authoritative decisions of the Supreme Court have so construed this anti-trust act as to give it a broader application than the prohibition of contracts and agreements in restraint of trade at the common law. It is not essential that the restraint shall be unreasonable within the well-understood definition of an unlawful restraint before the statute. Under this act the validity of an alleged combination or contract in restraint of trade, interstate or foreign, is to be determined by the terms of the statute which forbids any such contract or combination without respect to its nature or beneficial results. We need only cite the latest utterance of that court upon the subject. Loewe v. Law-

lor, 208 U. S. 274, 297, 28 Sup. Ct. 201, 52 L. Ed. 488; Northern Securities Co. v. United States, 193 U. S. 197, 331, 24 Sup. Ct. 436, 48 L. Ed. 679. But the power of Congress to legislate upon the subject, aside from the territories and the District of Columbia, is derived from its power to regulate commerce among the states and with foreign nations. It is therefore well settled that it does not apply to restraints or monopolies as such, but only to those which directly and immediately, or those which necessarily, affect commerce among the states or with foreign nations. If the law were held applicable to contracts or combinations indirectly or remotely affecting such commerce, it would substantially obliterate the distinction between interstate and intrastate commerce, the latter being as exclusively within the regulating power of the state as is the former within the power of Congress. In Hopkins v. United States, 171 U. S. 578, 594, 600, 19 Sup. Ct. 40, 45, 46, 43 L. Ed. 290, Mr. Justice Peckham emphasizes this obvious limitation when, speaking for the court, he said:

"There must be some direct and immediate effect upon interstate commerce in order to come within the act."

The same discriminating justice then adds:

"An agreement may in a variety of ways affect interstate commerce, just as state legislation may, and yet, like it, be entirely valid, because the interference produced by the agreement or by the legislation would not be direct. * * * The act must have a reasonable construction, or else there would scarcely be an agreement or contract among business men that could not be said to have, indirectly or remotely, some bearing upon interstate commerce, and possibly restrain it."

This limitation of the act to those contracts and combinations which directly and immediately or necessarily affect commerce among the states is recognized in a long series of opinions. Among them are: United States v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325; Addystone Pipe Co. v. United States, 175 U. S. 211, 242, 20 Sup. Ct. 96, 44 L. Ed. 136; Montague & Co. v. Lowry, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608; Northern Securities Co. v. United States, 193 U. S. 197, 331, 24 Sup. Ct. 436, 48 L. Ed. 679; Loewe v. Lawlor, 208 U. S. 274, 297, 28 Sup. Ct. 301, 52 L. Ed. 488. The Knight Case, in its last analysis, is but a striking illustration of the rule that the monopoly or agreement to come within the act must directly and immediately affect interstate commerce. Confining the case to its facts, it establishes the proposition that a mere combination between manufacturers only, by which a monopoly of a product results, is not, without other special circumstances, sufficient to justify an active intervention under the act to undo a contract by which such monopoly has been brought about. That the product thus monopolized by such combination of mere manufacturers may ultimately find itself into the stream of interstate commerce is there held not to be such a special circumstance as to constitute the direct and immediate effect upon commerce among the states as to bring the agreement within the act. Subsequent cases have been distinguished from it, but it has never

been overruled. In Addystone Pipe Co. v. United States, 175 U. S. 211, 240, 20 Sup. Ct. 96; 107, 44 L. Ed. 136, it was said:

"The direct purpose of the combination in the Knight Case was the control of the manufacture of sugar. There was no combination or agreement, in terms, regarding the future disposition of the manufactured article; nothing looking to a transaction in the nature of interstate commerce. The probable intention on the part of the manufacturer of the sugar to thereafter dispose of it by sending it to some market in another state was held to be immaterial and not to alter the character of the combination. The various cases which have been decided in this court relating to the subject of interstate commerce, and to the difference between that and the manufacture of commodities, and also the police power of the states as affected by the commerce clause of the Constitution, were adverted to, and the case was decided upon the principle that a combination simply to control manufacture was not a violation of the act of Congress, because such a contract or combination did not directly control or affect interstate commerce, but that contracts for the sale and transportations to other states of specific articles were proper subjects for regulation because they did form part of such commerce."

Referring to the facts in the Addystone Case as taking it out of the Knight Case, the court said:

"We think the case now before us involves contracts of the nature last above mentioned, not incidentally or collaterally, but as a direct and immediate result of the combination engaged in by the defendants.

"While no particular contract regarding the furnishing of pipe and the price for which it should be furnished was in the contemplation of the parties to the combination at the time of its formation, yet it was their intention, as it was the purpose of the combination, to directly and by means of such combination increase the price for which all contracts for the delivery of pipe within the territory above described should be made, and the latter result was to be achieved by abolishing all competition between the parties to the combination. The direct and immediate result of the combination was therefore necessarily a restraint upon interstate commerce in respect of articles manufactured by any of the parties to it to be transported beyond the state in which they were made. The defendants, by reason of this combination and agreement, could only send their goods out of the state in which they were manufactured, for sale and delivery in another state, upon the terms and pursuant to the provisions of such combination. As pertinently asked by the court below, was not this a direct restraint upon interstate commerce in those goods?"

In Loewe v. Lawlor, 208 U. S. 297, 28 Sup. Ct. 305, 52 L. Ed. 488, it was said of the combination involved in the Knight Case that "the purpose of the agreement was not to obstruct or restrain commerce. The object and intention determined its legality." Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518, was a case of a combination between fresh meat dealers, dominating a large proportion of the trade in the United States, for the purpose of regulating prices, shipments, and freight rates to the exclusion of competition. The combination was, of course, invalid within the law. The court, in its opinion by Justice Holmes, in dealing with the effect of the combination as a restraint upon commerce among the states, said that restraint of that commerce was—

"a direct object; it is that for which the said several specific acts and courses of conduct are done and adopted. Therefore the case is not like United States v. Knight Co., where the subject-matter of the combination was manufactories within a state. However likely monopoly of commerce among the states in the article manufactured was to follow from the agreement, it was not a

necessary consequence nor a primary end. Here the subject-matter is sales, and the very point of the combination is to restrain and monopolize commerce among the states in respect to such sales."

The specific thing complained of in the case for decision is that one Michigan mining corporation has obtained by purchase or proxy a majority of the capital shares of another Michigan mining corporation, and purposes to exercise its voting power to place in the directory of the latter a majority of its own selection from its own board of officers. The specific relief sought is an injunction against the exercise of the voting power, and a decree compelling a disposition of the shares so held under purchase or proxy. What has the Calumet & Hecla Mining Company done or what does it threaten to do which is a violation of the anti-trust act of Congress? It has the legal right to purchase and vote shares of stock in the Osceola Company under the laws of Michigan. This we have already considered. Of course, if such stock ownership and such stock control is enough to constitute a direct and immediate or necessary restraint upon trade and commerce between the states, the sanction of the state act goes for nothing. This much is settled by the Northern Securities Case, for a state cannot give to a corporation the lawful right to do anything which is a direct restraint of commerce between the states. How, then, does the exercise of the power of stock control by one mining or manufacturing corporation over another in the same state directly and immediately or necessarily operate as a restraint of commerce among the states? Confessedly the products of these two companies are in competition in the markets, and confessedly the greater part of the product of each will, sooner or later, enter into the stream of interstate commerce, for the chief demand for the product is outside the state of production. But that is not enough. There was all this and more in the Knight Case. If, indeed, such stock control results in a monopoly, it is only a monopoly in manufacture in the same state, and we have again the conceded situation in the Knight Case. Unless that monopoly of manufacture in a single state of a product which goes into interstate commerce directly and immediately or necessarily interferes with or restrains that commerce, the monopoly does not come under the act of Congress. But we are unable to conclude upon this record that mere stock control of such a company by another in the same state either directly or necessarily destroys competition there, or, if it did, that it results in any such monopoly as to directly or necessarily and immediately affect commerce among the states.

The Calumet & Hecla Mining Company does not own a majority, nor anything like a majority, of the stock of the Osceola Consolidated Mining Company. If it has the power to cast a majority of votes at a stockholders' meeting, it is because there are enough of the stockholders of the latter company willing to co-operate with it in the selection of a board. But it does not follow, if we assume for the purposes of this case that the evil is the same whether its power of election is due to a combination of shares own-

ed with proxies or by the ownership of a majority of all the stock, that the ownership constitutes a legal control, or that competition is thereby ended. A board elected by the owner of such a majority would not in any legal sense be the control of such majority owner, nor from such ownership could the legal inference be drawn, that the Calumet & Hecla Company dominated the management of the Osceola Company. The two companies would still remain separate corporations, each managed presumably in its own interest. Pullman Co. v. Missouri Pacific Co., 115 U. S. 587, 596, 6 Sup. Ct. 194, 29 L. Ed. 499; Porter v. Pittsburg Bessemer Steel Co., 120 U. S. 649, 670, 7 Sup. Ct. 1206, 30 L. Ed. 830; Richmond Construction Co. v. Richmond, 68 Fed. 105, 15 C. C. A. 289, 34 L. Ed. 625. But if the presumption be, in respect to a question of restraint or monopoly under the act of Congress, that the power to determine the management of a competing corporation through ownership of a majority of shares constitutes a suppression of competition, we come to the inquiry as to whether such presumption is one of fact or law. If one of fact, as it evidently is, it is rebuttable. We quite agree that purpose or motive is of no moment, provided the contract or agreement directly provided for the suppression of competition, or when such a result, as a matter of law, must necessarily occur. United States v. Freight Ass'n, 166 U. S. 291, 17 Sup. Ct. 540, 41 L. Ed. 1007; Chesapeake & Ohio Fuel Co. v. United States, 115 Fed. 610, 623, 53 C. C. 256. But when the agreement or combination in question does not in its terms provide for the suppression of competition or the creation of a monopoly, nor bring about such a result as a necessary legal consequence, but requires further acts or conduct to bring about such an unlawful result, some evidence of an unlawful intent becomes essential, that the court may see that, if not stopped, a prohibited restraint is likely to be created. In Swift Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518, it was said by Mr. Justice Holmes, that:

"The statute gives this proceeding against combinations in restraint of commerce among the states, and against attempts to monopolize the same. Intent is almost essential to such a combination, and is essential to such an attempt. Where acts are not sufficient in themselves to produce a result which the law seeks to prevent—for instance, the monopoly—but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. Commonwealth v. Peaslee, 177 Mass. 267, 272, 59 N. E. 55. But when the intent and the consequent dangerous probability exist, this statute, like many others and like the common law in some cases, directs itself against the dangerous probability as well as against the complete result."

The power of stock control which the Calumet Company has acquired may be exercised only in a legitimate and lawful way in the interest of an economical management of both companies. In that case, it has done nothing directly affecting commerce among the states.

On the other hand, that power may be a mere preparation for the doing of acts which will directly and necessarily interfere with the

freedom of that kind of commerce which it is the purpose of Congress to protect. When this unlawful use of the power shall result in an unlawful restraint, or further steps shall point to results directly affecting such commerce, there may be interference by the courts.

The Calumet & Hecla Mining Company vigorously deny any purpose to either bring about a monopoly, restrain competition, or diminish production, and assert that their only object was to extend their industrial life by the acquirement of an interest in the ore-producing lands of the Osceola Company and the more economical management of their own property by a friendly and mutually advantageous use of the facilities of the two companies. The. two properties are in large part contiguous. In a very convincing opinion, the judge who .heard the case below states the leading facts which made it desirable and economical that there should be, to a certain extent, a co-operation in future mining operations by the two companies, in order that certain poorer lodes underlying the conglomerate lode of the Calumet Company, which has been worked to a point where exhaustion is in sight, may be worked to the best advantage of both companies. We shall not go into the details. We refer and adopt the conclusion stated by Judge Knappen, who thus sums up the evidence relating to the motive or purpose actuating the Calumet & Hecla Mining Company:

"I am convinced, from a careful consideration of the testimony, that the controlling motive and purpose of the Calumet & Hecla Company in acquiring its interest in the mining properties mentioned was to extend its industrial life, and keep up and increase, if possible, its production and net earnings, and that the evidence fairly negatives a design thereby to reduce the output of any of the companies or artificially to increase or maintain the price of the product, or to stifle competition between the related companies, or to prejudice other stockholders generally of either company associated, or to interfere with the integrity of either company, a common management with separate detailed organization being contemplated. The evidence does not indicate that any use of the facilities of the associated companies is contemplated, except upon terms and in manner mutually advantageous."

But it is said that the stock control of the Osceola Company will result in a monopoly. If this be so, and it be only a monopoly in mining and refining copper brought about by the combination of two companies of the same state conducting their operations side by side, it is not enough, under the Knight Case, to bring the agreement within the act, even though the fact be that the product will in large part pass ultimately into interstate commerce. In the Knight Case, the American Sugar Refining Company, if permitted to combine with the four independent refining companies at Philadelphia, would control 98 per cent. of all the sugar refining in the United States. Such a combination undoubtedly brought about a monopoly under the common law. But as it was only a monopoly in manufacture, it was held not to be a restraint of trade among the states, although the great bulk of the product was ultimately destined for commerce among the states, the effect upon such commerce being indirect. There is, in fact, no parallel between the facts of that case and this in respect to the probable results of the two combinations. In this case it is shown that the world's production of copper in

1896 was approximately 1,600 million pounds, of which amount about 900 million pounds was produced in the United States. The production of the copper called "Lake Copper"—that is, copper produced in the Lake Superior region—was about 224 million pounds, or one-fourth of the entire product of the United States and one-eighth of the world's product. The Calumet & Hecla Company produced, of this amount, about 95 million pounds, and the Osceola Company about 18½ million pounds. So far from the "control" of the smaller company by the larger resulting in a monopoly, it is evident that the combined output would be less than one-half of the product of lake copper alone, or about one-ninth of the product of the United States and about one-fifteenth of the product of the world.

But the complainant has very seriously insisted that, in the determination of the question as to whether the stock control of the Osceola Company will result in a monopoly and an unlawful suppression of competition, every class or grade of copper should be eliminated except that particular class or grade made by the Calumet & Hecla Company and the Osceola Company and a few smaller producers, upon the contention that the product of these companies is a distinct commercial commodity, known in the market as "Best" or "Prime Lake Copper," as distinguished from Western or electrolytic copper. The great bulk of the copper of the world is treated electrically. The purpose is to free it from impurities, for the purer it is the greater its conductivity. Arsenic is an ordinary impurity, and the presence of this in small quantities adds, or is supposed to add, to the tensile strength of the copper, for which reason copper having this slight admixture of arsenic is preferred by some makers of copper wire. Hence some manufacturers of wire specify in their purchases of copper "Best" or "Prime Lake Copper," meaning copper not so electrically treated as to entirely eliminate this arsenical impurity. But it is demonstrated that electrolytic copper is capable of being used for every purpose for which "Best Lake Copper" can be used, and that they actively compete with each other in the markets of the world, though, as a rule, the quotations for "Best Lake" are slightly higher than Western or electrolytic copper. There is no material intrinsic difference between the two kinds. The court below, upon a full review of the evidence, expert and nonexpert, reached the conclusion that neither "Lake Copper" nor "Best Lake Copper" is so far a distinct commodity as to justify an elimination of the electrolytic copper as a factor in a case like this. In this we entirely concur.

When all is said which the facts justify, the acquisition of the voting power of a majority of the capital shares of the Osceola Consolidated Mining Company and its proposed exercise by the selection of a board, a majority of which to be composed of the members of the board of the Calumet & Hecla Company, is the main fact upon which the complainant must invoke the prohibition of the act of Congress. That fact is not enough. That the two companies are in a sense competitors, and that the product of their mines will ultimately go into interstate commerce, is far from making out a

case of direct or necessary and immediate interference with that kind of commerce. They do not show that even a monopoly of the product will ever probably ensue, to say nothing of the utter absence of any material evidence indicating that such a monopoly in the product of two contiguous mining companies would directly or necessarily affect commerce among the states. No express agreement is shown by which anything is to be done or left undone from which an unlawful restraint must, or will, probably happen. The case differs from all of the cases appealed to by the learned counsel for appellants in this important particular. In the Addystone Pipe Case, the agreement specifically provided a scheme for the suppression of competition between the parties in the matter of sales of iron pipe in a large number of states through a division of territory and sham bids, the parties agreeing to divide among each other a share in the profits made by the mill to which, by their concerted effort, the particular sale was directed. In Montague v. Lowry, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608, was involved an express agreement between manufacturers of tiles and dealers within a given territory by which the plaintiffs were unable, not being members of the combination, to procure titles without paying a great advance over those who were members of the combination. In the case of Swift & Company v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518, the agreement involved a combination between packers and dealers in fresh meat throughout the United States for the express purpose of regulating prices, freights, and shipments and sales of live stock. Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, involved a widespread combination among the union labor organizations to prevent the sale of hats anywhere within the United States made by a hat maker at Derby, Conn., until he should unionize his shops. In Chesapeake & Ohio Fuel Co. v. United States, 115 Fed. 610, 53 C. C. A. 256, there was an express agreement among 14 coal-mining companies engaged in interstate commerce for the purpose of fixing prices and regulating production and shipments. The cases of Continental Wall Paper Co. v. Voight, 148 Fed. 939, 78 C. C. A. 567, and John D. Park & Sons Co. v. Hartman, 153 Fed. 24, 82 C. C. A. 158, 12 L. R. A. (N. S.) 135, both being decided by this court, were cases which involved systems of contract between producers, wholesale and retail, carrying on business in every state of the Union, for the express purpose of maintaining prices and stifling competition, and were obviously cases which directly affected freedom of commerce among the states.

In the absence of any such express terms of the agreement providing for acts directly affecting interstate commerce, complainants must by facts and circumstances show that the direct and necessary result of what has been done and threatened is to restrain interstate commerce. The burden of showing acts and circumstances which establish the fact that an unlawful result is contemplated and will ensue, unless checked, is upon those asserting the illegality of the contract assailed.

In Cincinnati, P. B. S. & P. Packet Co. v. Bay, 200 U. S. 179, 184, 26 Sup. Ct. 208, 209, 50 L. Ed. 428, it is cogently said, in respect to the question as to whether a particular combination or agreement will operate to produce an unlawful result under the anti-trust law, that "a contract is not to be assumed to contemplate unlawful results unless a fair construction requires it upon the established facts."

No unlawful object has been shown, and no such facts established, as to convince us that the necessary consequence of the combination complained of will result in any direct, immediate, or necessary restraint of interstate commerce.

Finally, the facts of the case do not bring the conduct of the Calumet & Hecla Mining Company under the condemnation of the Michigan statute against monopolies. The purchase of shares and the acquirement of the additional 50,000 acres of copper-producing lands has the sanction of the express law of Michigan, and, while the power to acquire shares or additional lands may be subject to the condition that such acquisition shall not result in monopoly or the unlawful suppression of competition, there are no such results to be feared from the acts and conduct attributable to the Calumet & Hecla Mining Company as to bring it within the Michigan act.

The decree dismissing the bill and discharging the injunction must be affirmed.

COCHRAN, District Judge. I concur with Judge LURTON'S statement of fact and in the conclusion he has reached, but think best to state the particular ground upon which I have come to that conclusion. The principal ground upon which it is claimed that the decrees of the lower court should be reversed is that the transaction complained of was in violation of the national anti-trust act. It is urged also that it is in violation of the Michigan anti-trust act. The stress of the argument is upon the application of the national act, and I will proceed at once to address myself to the question as to whether it affects the legality of the transaction complained of.

Here, we must first inquire whether this question is an open one. Is or not a consideration thereof foreclosed by any decision of the Supreme Court? I think that it is, and that by the first decision made by that court under that act. I refer to the case of United States v. E. C. Knight Company, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325. It is practically conceded that this is so, if the authority of that case has not been overthrown or weakened by subsequent decisions. It is earnestly contended that it has been substantially overruled by later decisions of the Supreme Court. The decisions relied on are those in the cases of Addystone Pipe & Steel Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136; Northern Securities Company v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679; Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518; Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488. It is claimed that the decision in the Addystone Pipe & Steel Company Case left not much, if any, force in it, and that in the Swift Case left nothing of it. But the deci-

sion in the Northern Securities Company Case is claimed to be more in point than either of the others, as its facts fit more closely the facts of the Knight Case, and it is said that these suits were brought on the basis of the decision in that case. It is further claimed that the majority of the court in the case of United States v. American Tobacco Company (C. C.) 164 Fed. 700, took the position that the Knight Case is no longer any proper foundation for the point decided in it. In answer to the possible suggestion that in no subsequent case has the Supreme Court expressed any doubt as to the correctness of the decision in that case, and that whenever it has referred thereto it has done so with seeming approval, it is said that the Supreme Court had in mind that the facts of the case were different from what they really were, and that what it so approved was this supposititous case and not the real case. This is shown, it is claimed, by the consideration that the points actually decided in these later cases are in direct conflict with that really decided in the Knight Case.

I think that the majority of the court in the American Tobacco Company Case hardly went as far as claimed, but at least two of the three judges constituting that majority did question the correctness of the decision in that case, and did intimate that it was overthrown by the later decisions. Judge Lacombe said that it seemed to him that subsequent decisions of the Supreme Court had modified the opinion in that case, and Judge Coxe that it was interesting to note that the Chief Justice, who wrote the opinion of the court therein, also wrote the unanimous opinion in Loewe v. Lawlor, that an examination of numerous decisions since that case leads to the conclusion that there has been constantly a tendency towards a broader and more liberal construction of the statute or wider scope therefor, and that the only distinction between that case and the Loewe-Lawlor Case is that in one the acts complained of related to the manufacture and sale of sugar and in the other to the manufacture and sale of hats. Both these judges seem to indicate a preference for the view taken by Justice Harlan in his dissenting opinion. I do not find that Judge Noyes, the other judge of the majority, questioned the authority of that decision to any extent. Judge Ward, who dissented, took the position that that decision had not been affected by any subsequent one and is still in full force. Counsel for appellant attacked that case in the lower court, the same as here, and possibly with some measure of success, as it seems to have been somewhat shy of basing the conclusion reached on the authority thereof.

The vital relation of the Knight Case to this case, and the attack made upon it in the American Tobacco Company Case and here, calls for a somewhat extended consideration thereof. The propriety of so doing is helped out by the fact that this seems to be the first case that has arisen since then involving the exact question involved therein. I do not understand that the American Tobacco Company Case hinges upon that case, as this one does. Besides, a true conception of what was decided therein and the reasoning upon which it was based is essential to a correct determination of the effect thereon of the later cases which are claimed to have overthrown it.

I may say at the outset that I think that that case not only fits this case, and has not been affected by the decision in any subsequent case, but that it was correctly decided; and, further, that it is not likely that it was incorrectly decided. The conclusion there reached represented not only the views of all the members of the Supreme Court except Justice Harlan, who dissented, and Justice Jackson, who did not sit therein because of illness, but of the Circuit Court of the Eastern District of Pennsylvania, where the case originated, and of the Circuit Court of Appeals for the Third Circuit, where it was first carried on appeal. And though Mr. Justice Jackson did not sit in the case, the conclusion reached accorded with his views as expressed in the case of In re Greene (C. C.) 52 Fed. 104, a case of like character, and those courts, in deciding as they did, simply followed in the path which he had theretofore clearly marked out.

In considering this case, I would direct the attention singly to three separate and distinct matters. They are, first, the condition of things before the doing of the thing complained of therein; second, the thing done that was complained of; and, third, the thing sought to have done. The condition of things referred to was this: The American Sugar Refining Company, a New Jersey corporation, in New York, New Jersey, and several other places, was engaged in the business of refining sugar thereat and selling the sugar so refined. The business which it so did was 65 per cent. of the business of that kind done in the United States. The E. C. Knight Company, the Franklin Sugar Company, the Spreckels Sugar Refining Company, and the Delaware Sugar House, each of which was a Pennsylvania corporation and had no connection with the others, owned like plants located at Philadelphia, and were engaged in the business of refining sugar at their respective refineries and selling the sugar so refined. The business done by all four was 33 per cent. of the whole. The business done by the five, therefore, constituted 98 per cent. thereof. The other 2 per cent. was done by a Massachusetts corporation, the Revere, whose plant was located at Boston. Each one of the five corporations was engaged in external commerce. They sold sugar for delivery in other states than where made and sold, and no doubt a great, if not the principal, part of the business done by them was so sold. The facts of the case will not allow this feature thereof to be minimized; and, as I view it, there is no occasion to minimize it.

Then, what was the thing done that was complained of? The American Company purchased the entire capital stock of the other four companies, and gave in exchange therefor shares of its own stock. It thus acquired control of 98 per cent. of the business of making and selling refined sugar in the United States. This control as to 65 per cent. was by virtue of its ownership of its own plant, and as to 33 per cent. by virtue of its ownership of the entire capital stock of the other four companies, enabling it to choose the boards of directors thereof, who would have control of the operation of their plants respectively. And the acquisition of such stock was for the purpose of obtaining such control. This feature of the case, also, is not to be blinked.

And finally, as to the thing sought to have done. It was simply an undoing of what had been done, and an injunction against attempting to do it again. It was held that the nation was not entitled to have this thing done. We are thus brought face to face with the reasoning upon which this conclusion was based. It was not that what had been done was not within the national act. The court went deeper than this. It was that the nation, through Congress, by the national act, had no right to attempt to prevent what had been done from being done, and hence had no right to complain of its being done. Of course, this being so, the presumption was that the nation, through Congress, had not by the national act attempted to prevent what had been done from being done, and hence that it was not within the act. But the court concerned itself with the deeper question—with what was fundamental, and not with what was accidental. And, if I may be permitted to suggest it, I think that the confusion that has arisen as to the correctness and effect of the decision in the Knight Case and the effect thereon of the later decisions is due to the fact that it has been overlooked that concern was there had, not with what the act meant, but with what the nation, through Congress, had power to enact.

How, then, was it made out that the nation had no right, through Congress, by that act, to prevent what had been done from being done, and hence had no right to complain of its being done. It was in this way. What had been done was not external commerce, nor did it relate to or affect directly such commerce, and hence did not come within the commercial provision of the national Constitution, which was the only provision thereof that could be claimed to authorize the nation, through Congress, to prevent what had been done from being done. So far as it was commerce at all or was related to or directly affected commerce, it was internal commerce, and the doing of it was solely within the state's jurisdiction. Mr. Chief Justice Fuller emphasized the importance of respecting the boundary of each government's jurisdiction. It was "vital," he said, that "the delimitation between the two, however sometimes perplexing, should always be recognized and observed." And, further, he said that "acknowledged evils, however grave and urgent they may appear to be, had better be borne than the risk be run in the effort to suppress them of more serious consequences by resort to expedients of even doubtful constitutionality."

To complete the line of reasoning upon which the conclusion reached is based, it remains to indicate wherein what had been done was held not to be external commerce and not to relate thereto or affect it directly. It was essential both that it was not such commerce, and that it did not relate thereto or so affect it, in order that what had been done should have been beyond the national jurisdiction. The nation has jurisdiction of what relates to or affects directly external commerce as well as external commerce itself under the commercial provision. It is necessary to complete jurisdiction of such commerce. Jurisdiction of the thing itself would be of but little consequence if jurisdiction did not also cover that which related thereto or affected

it directly. It is only of what is not external commerce and affects it only indirectly that it does not have jurisdiction. There was no room to claim that what had been done was itself external commerce. What had been done was simply the purchase by the one company of the entire capital stock of the other four, and the giving in exchange therefor shares of its own capital stock. If it be a fact that a sale of such stock for delivery in another state than that where the sale was made would have been external commerce, there was no such sale made. The most that can be claimed is that what had been done related to or affected directly such commerce. Did it do so?

Each corporation was a Pennsylvania corporation. The refineries and other property owned by each was internal. The operation of the refineries and manufacture of refined sugar thereat was internal. It was only when the corporations were engaged in selling the sugar so made that things took on an external hue, and then only in case sales for delivery outside of the state were made. Commerce has been likened to a stream, and sugar produced at those refineries did not become a part of external commerce until placed in the stream of external commerce, which would be when sold for delivery on the outside. Sales for delivery within the state were purely internal. Now, the purchase of the stock had no relation to and did not affect in any way the sugar that had been put into the stream of external commerce prior thereto. That was a matter of the past. Nor did it relate to or affect directly the sugar that might be placed therein thereafter. It depended entirely on whether thereafter the refineries were operated, and, if operated, on whether, if any of the sugar thereafter refined thereat were placed in said stream, such purchase would affect it at all. The mere fact that the intent and purpose was to place such sugar therein could not make such purchase relate to or affect directly external commerce. It may be said that it affected it, but only indirectly so. If it can be said that it affected it directly, then, whenever one, under any circumstances, intends and purposes to place property owned by him in the stream of external commerce, such commerce is affected directly, and he and that property pass within the national jurisdiction. But this cannot be. As well said by Mr. Justice Lamar in the case of Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6, 32 L. Ed. 346:

"If it be held that the term (commerce) includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include the productive industries that contemplate the same thing. The result would be that Congress would be invested to the exclusion of the states with the power to regulate not only manufacturers, but also agriculture, horticulture, stock raising, domestic fisheries, mining—in short, every branch of human industry."

In the Knight Case Mr. Chief Justice Fuller said:

"Slight reflection will show that if the national power extends to all contracts and combinations in manufacture, agriculture, mining, and other productive industries, whose ultimate result may affect external commerce, comparatively little of business operations and affairs would be left for state control."

The purchase of those stocks no more related to or affected directly external commerce than if the American Company, instead of pur-

chasing them, had purchased from those corporations themselves their refineries and other property. Purchase of the capital stock was but an indirect way of acquiring the properties themselves. By the purchase, instead of acquiring the properties of the corporations, they acquired an interest in the corporations that owned them. If the properties of the corporations had been owned and operated, not by the corporations, but by trustees for the benefit of the stockholders, a purchase from the cestuis que trustent of their beneficial interests would have had no more relation to or affected no differently external commerce than a purchase from the trustees.

Such, then, is the line of reasoning by which the Supreme Court reached its conclusion in the Knight Case. I have put it in a different and somewhat amplified form in an effort to make it plain, but a reading of Mr. Chief Justice Fuller's opinion will show that I am justified in claiming that such is the reasoning on which that conclusion is based.

Before passing from the consideration of this case, it is to be noted that it was not involved therein whether if, after the purchase, those corporations had entered into an agreement amongst themselves concerning the external commerce to be done by them, such an agreement would have related to and affected directly such commerce and been within the national jurisdiction. What was sought to have done was not the undoing of any such agreement, but the undoing of the purchase of the stock. Nor was it involved therein whether the nation, through its jurisdiction over commerce among the states and with foreign nations, could by appropriate legislation have excluded from such commercial stream any of the sugar that had been manufactured at the refineries of any of the five corporations. These two questions are entirely distinct from that which arose and was decided in that case. That question was whether the one corporation had the right, so far as the national act was concerned, to purchase the capital stock of the other four. It was held that it did, and it seems to me that there is no escape from that conclusion and the reasoning on which it is based.

We come, then, to the question whether this decision has been affected to any extent by the subsequent decisions of the Supreme Court. As heretofore stated, I do not think that it has; and I will now attempt to make this position good. The extended consideration of the Knight Case renders unnecessary any like consideration of the cases, the decisions in which are claimed to have affected that in that case. A very general reference thereto will be sufficient to show that they have in no wise affected it. Take, for instance, the Addystone Pipe & Steel Company and Swift Cases, which are somewhat alike in their essential characteristics. Each of these cases involved an agreement between several independent manufacturers or producers, the one of iron pipe and the other of meat, each of whom was engaged in interstate commerce, which agreement related to and directly affected that commerce so far as they were engaged in it in the way of restraining it, their independency being preserved except so far as affected by that agreement. It was held that the agree-

167 F.—47

ment in each case was a combination within the national act, and its further execution was enjoined. In the Swift Case the agreement related to and affected some matters that may be said to have been purely internal as well as to the external commerce of the parties thereto, and the execution of the agreement in those particulars was enjoined as well as in so far as it affected such commerce. The necessities of this case do not require a presentation of the line of reasoning by which Mr. Justice Holmes justifies this part of the decision. That portion thereof in no way concerns the Knight Case.

Then as to the case of Loewe v. Lawlor, sometimes referred to as the "Danbury Hat Case." That case involved the question whether a boycott on the part of the United Hatters and affiliated organizations of laborers against the external commerce of the manufacturers of those hats was a combination within the national act. It was held that it was and its continuation was enjoined.

Now, I fail to see how these three cases have any bearing whatever on the Knight Case. A decision that a combination that relates to and affects directly external commerce within the national act is certainly not antagonistic to one that decides that a transaction which does not relate thereto and affects it indirectly only is not within that act. Nor is a decision that an agreement between two or more corporations with reference to the external commerce done by them relates thereto and affects it directly antagonistic to one that decides that a purchase by one competitor of the property by which he carries on such business does not relate to external commerce and affects it indirectly only. Of similar character to these three cases is that of Montague v. Lowry, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608.

Finally, how is it as to the Northern Securities Company Case? It must be conceded that this case is more like the Knight Case than either of the others. The minority judges in that case, as represented by the dissenting opinion of Mr. Justice White, regarded that the Knight Case required a decision that the transaction there involved was not within the national act. Of course, if this position was correct, then the decision in that case does conflict with that in the Knight Case, and the latter case must be considered to have been overthrown by the former. The likeness between the two cases consists in the fact that in the later case, as in the earlier one, the validity of the purchase of the stock in a corporation was involved. But even here there was a difference. In the earlier case the purchasing corporation was engaged in the same business as that of the corporations whose stock it purchased, and those corporations were competitors of it, whereas in the later case the purchasing corporation was not engaged in the same business as that of the competing corporations whose stock it purchased. It was engaged in no business except that of purchasing and holding that stock. But in this case, as in that, the effect of the purchase was to put the control of the competing corporations in one and the same hand. There was, therefore, nothing in this difference to cause a difference of decision. If one of the competing corporations in the Northern Securities Company Case had purchased the capital stock of the other, we would have thus far

exactly the same case as the Knight Case. And the purchase by the outside corporation of the capital stock of the two competing corporations was, in its legal significance, nowise different from a purchase by one of the two of the capital stock of the other.

But here the likeness between the two cases stops. In a striking particular they are different—so different in this particular as to necessitate, in my judgment, a difference of decision. That particular was this: The property of each of the two competing corporations, to wit, the Great Northern Railway Company and the Northern Pacific Railway Company, was interstate in its character, and the operation thereof was interstate. It follows that the purchase of the stock of the two corporations and combining them in one corporation was an interstate transaction. That transaction related to and affected directly interstate commerce. It did so as much as if the one corporation had purchased the property of the other. If that had been the nature of the transaction, it could not have been contended that it was not interstate in its character. How different this from what we have found to have been the case in the Knight Case. The properties of the four Pennsylvania corporations and their operation were not interstate in their character. They were purely internal to the state of Pennsylvania, and likewise would have been their purchase by the New Jersey corporation. Nowise different was the purchase by it of the capital stock of these corporations. It follows that there was no room to claim in the Northern Securities Company Case that the transaction there involved was not within the national jurisdiction. The question raised was solely as to whether that transaction was within the meaning of the national act. It is true that Mr. Justice White argued strenuously that it was not within that jurisdiction, but, with all due respect, I submit that he was in error here. The basis of his argument that the transaction attacked was not within the national jurisdiction was that the purchase by the Northern Securities Company of the capital stock of the two railway companies was not interstate commerce. That is undoubtedly true. But that circumstance was not sufficient to take the transaction out of such jurisdiction. If, though not itself interstate commerce, it related to and affected directly interstate commerce, then it was within that jurisdiction. That it did so is evident from the fact that it was a purchase of the stock of corporations whose property and the operation thereof was interstate. It was as much interstate as if one of the two competing corporations had purchased the capital stock or the property of the other.

I, therefore, conclude that, to no extent whatever, has the authority of the Knight Case been affected by any of the later decisions of the Supreme Court.

Before quitting this branch of the case, it may be proper to show that the Knight Case fits this case, though, as heretofore stated, it is practically conceded that it does. The Calumet & Hecla Company has not acquired the entire capital stock of the Osceola Company. It has not acquired the ownership of a majority of that stock. It has acquired the ownership of a portion, and the right to vote another

portion, the two together being a majority thereof. The business here. involved is that of mining instead of refining sugar. Otherwise there is no difference between that case and this. The property of the Osceola Company and its operation is internal to the state of Michigan, as that of the Pennsylvania corporations was to that state. The differences in detail referred to do not call for a difference of decision. The conclusion must be reached, then, that the transaction complained of herein is not within the national act. If the Calumet & Hecla Company had purchased the property of the Osceola, or if that property had been held by a trustee for the benefit of its stockholders and the Calumet & Hecla Company had purchased the beneficial interests of the cestuis que trustent, certainly the transaction would not in either case have been within that act. No more can it be said that a purchase by it of the capital stock, or a majority thereof, or of a portion thereof and the right to vote another portion, the two together constituting a majority, is within it.

It seems to me that the existence of any difficulty in determining how this case ought to be decided, so far as this question is concerned, is due to the manner in which it is approached. If it is approached in an effort to reach a conclusion as to whether the transaction involved is within the meaning of the national act, it may be hard to dispose of it correctly. But if it is approached as the Knight Case was approached by the judges of the different courts who rendered opinions, holding that the transaction attacked therein was not within that act, which was in an effort to reach a conclusion as to whether it was within the national jurisdiction, and consequently whether it could properly have been put within that act, no room for doubt as to how it ought to be decided will be left.

As indicated at the start, it is also claimed that the transaction involved. here is within the state act. The claim that it is so is based largely, if not altogether, on the same line of reasoning upon which it is claimed to be within the national act. Indeed, on the one side, it seems to be claimed to be within the state act because it is within the national act, and, on the other hand, that is not within the state act because it is not within the national act. This, no doubt, is due to the fact that both sides of this case have approached it from the standpoint as to what is the true meaning of both acts, and not from the standpoint as to which jurisdiction—national or state—the transaction complained of is within. So approaching it, it was but natural to feel that the question whether that transaction was within the state act depended on whether it was within the national act. For the language of both acts is substantially similar, though that of the state act is somewhat more verbose. But approaching it from the proper standpoint, as I have claimed it to be, as soon as it is determined that the transaction in question is not within the national act, it is at once realized that it does not necessarily follow that because it is not within the one act it is not within the other. The transaction being within the state jurisdiction, and not within the national, it may well be within the state act, though not within the national. The question, then, as to whether it is within the state act hangs on whether

it is within the words thereof, construed in the light of the circumstance that the state had power to put it there.

So construing these words, how does the matter stand? The Calumet & Hecla Company and the Osceola Company were created and organized, and have ever since continued, to transact business under a general act of the state of Michigan providing for the incorporation of companies for mining, smelting, and manufacturing copper and other metals. By that act, any two or more corporations existing thereunder may consolidate. This court in the case of Marbury v. Kentucky Union Land Co., 62 Fed. 335, 10 C. C. A. 393, held that an act authorizing two corporations to consolidate, also authorizes one to purchase the capital stock of the other, on the principle that the greater includes the less. But this was not the only authority that the Calumet & Hecla Company had to purchase the stock of the Osceola. By an amendment to that general act, approved May 10, 1905 (Pub. Acts 1905, p. 153, No. 105), a company organized thereunder was expressly authorized "to subscribe to, purchase, acquire and own" stock in any company organized thereunder. Neither the provision authorizing a consolidation or purchase of stock has ever been repealed or modified to any extent, unless it has been done by the anti-trust legislation. There are two anti-trust acts in Michigan, one aproved June 23, 1899 (Pub. Acts 1899, p. 409, No. 255), and another, declared to be "supplementary to and declaratory of and in addition to" the earlier act, approved June 20, 1905 (Pub. Acts 1905, p. 507, No. 329). The original act was in existence at the time of the approval of said amendment of May 10, 1905, and the supplementary one was approved subsequent to its approval. The one is entitled "An act to prevent trusts, monopolies and combinations," etc., and the other "An act relative to agreements, contracts and combinations in restraint of trade or commerce." It is not necessary to quote from the body of either act. Each contains general language in the line of its title. There is no express reference to the legislation referred to as contained in said general act and the amendment thereto. It is not to be taken that it impliedly has reference thereto. That legislation and those acts can be construed together, and I think that within well-recognized principles they ought to be so construed. So construing them, it is not to be held that what the one expressly authorizes is denied by the other.